# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |
|---|---|
| OPEN SOCIETY JUSTICE INITIATIVE, | x : : |
| Plaintiff, | : : : |
| -against- | : : No. 20-cv-06625 (PAE) |
| OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, | : : : |
| Defendant. | : : x |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


**BRIEF OF SENATOR RON WYDEN**
**AND REPRESENTATIVE TOM MALINOWSKI**
**AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF**

Anne Champion
Lee R. Crain
Alexandra Perloff-Giles
Jabari Julien (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 351-4000
Email:  achampion@gibsondunn.com

*Counsel for Amici Curiae Senator Ron*
*Wyden and Representative Tom Malinowski*

## TABLE OF CONTENTS

Page

STATEMENT OF AMICI CURIAE .............................................................................. 1

INTRODUCTION ....................................................................................................... 2

ARGUMENT .............................................................................................................. 5

    I.   Disclosure of the ODNI Report Would Not Compromise National Security or Reveal Intelligence Sources or Methods.......................................................... 7

    II.  Disclosure Comports with Congressional Intent ....................................... 13

CONCLUSION........................................................................................................... 19

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*Am. Jewish Cong. v. Kreps*,
    574 F.2d 624 (D.C. Cir. 1978) ........................................................................14, 18

*Assoc. Press v. U.S. Dep't of Def.*,
    554 F.3d 274 (2d Cir. 2009) .....................................................................................5

*CIA v. Sims*,
    471 U.S. 159 (1985) ..................................................................................................7

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*,
    746 F.3d 1082 (D.C. Cir. 2014) .............................................................................19

*Hayden v. Nat'l Sec. Agency*,
    608 F.2d 1381 (D.C. Cir. 1979) .............................................................................10

*Irons & Sears v. Dann*,
    606 F.2d 1215 (D.C. Cir. 1979) ........................................................................13, 14

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) ..................................................................................................5

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) .................................................................................6

*N.Y. Times Co. v. U.S. Dep't of Justice*,
    756 F.3d 100 (2d Cir. 2014) .....................................................................................7

*Nat'l Council of La Raza v. Dep't of Justice*,
    411 F.3d 350 (2d Cir. 2005) .....................................................................................5

*Nitro-Lift Techs., L.L.C. v. Howard*,
    568 U.S. 17 (2012) ..................................................................................................14

*Ray v. Turner*,
    587 F.2d 1187 (D.C. Cir. 1978) .............................................................................19

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989) ................................................................................................18

*U.S. Dep't of State v. Ray*,
    502 U.S. 164 (1991) ..................................................................................................5

*Wilner v. NSA*,
    592 F.3d 60 (2d Cir. 2009) .......................................................................................6

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Wisconsin Project on Nuclear Arms Control v. U.S. Dep't of Commerce,*
317 F.3d 275 (D.C. Cir. 2003) ................................................................13

**Statutes**

5 U.S.C. § 552 .......................................................................2, 5, 6, 19

50 U.S.C. § 3024 ...........................................................................6

Pub. L. No. 116-92, § 1277 (Dec. 20, 2019) .....................................16, 17

Pub. L. No. 116-92, § 5714 (Dec. 20, 2019) .....................................16, 17

Pub. L. No. 116-260, § 625 (Dec. 27, 2020) ....................3, 9, 11, 18, 19

**Other Authorities**

165 Cong. Rec. H5799 (daily ed. July 15, 2019) (statement of Rep. Malinowski) .......................16

165 Cong. Rec. H5814 (daily ed. July 15, 2019) .......................................16

165 Cong. Rec. S4472 (daily ed. June 24, 2019) (statement of Sen. Wyden) ................................5

The Administration's Inaction on the Killing of Jamal Khashoggi, Press
Conference (Mar. 3, 2020), https://bit.ly/2WTfolO .......................3, 4, 11, 12

Annex to the Report of the Special Rapporteur on Extrajudicial, Summary or
Arbitrary Executions: Investigation into the Unlawful Death of Mr. Jamal
Khashoggi (June 19, 2019), A/HRC/41/CRP.1, *available at*
https://www.ohchr.org › Documents › A_HRC_41_CRP.1.docx ............................8

Executive Order 13,526 ......................................................................6

H.R. 2037, 116th Cong. § 2(a) (2019) ..........................................................15

H.R. Rep. No. 89-1497 (1966) ..................................................................5

Press Release, Rep. Tom Malinowski (Dec. 10, 2019),
https://malinowski.house.gov/media/press-releases/representative-
malinowski-statement-ndaa-deal ............................................................17

Press Release, Sen. Ron Wyden (June 24, 2019),
https://www.wyden.senate.gov/news/press-releases/-wyden-if-the-
intelligence-community-wont-release-report-on-murder-of-us-based-
journalist-congress-must-release-it ...........................................................11

S.J. Res. 69 (115th Cong. 2017–2018) ...........................................................8

**TABLE OF AUTHORITIES**

(continued)

Page(s)

S. Rep. No. 89-813 (1965)...................................................................................................5

S. Rep. No. 116-47 (2019)............................................................................................14, 15

Shane Harris, Greg Miller & Josh Dawsey, *CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi's Assassination*, WASH. POST (Nov. 16, 2018) .............................8

U.S. Dep't of the Treasury, *Treasury Sanctions 17 Individuals for Their Roles in the Killing of Jamal Khashoggi* (Nov. 15, 2018),
https://home.treasury.gov/news/press-releases/sm547 ............................................................8

Zachary Halaschak, *Adam Schiff Asks Acting Spy Chief Richard Grenell to Declassify Documents Related to Khashoggi Killing* (Feb. 27, 2020),
https://www.washingtonexaminer.com/news/adam-schiff-asks-acting-spy-chief-richard-grenell-to-declassify-documents-related-to-khashoggi-killing.........................10

## STATEMENT OF AMICI CURIAE[1]

*Amicus* Ron Wyden is the senior United States Senator for the state of Oregon, a seat he has held since 1996.  Since 2001, Senator Wyden has served on the Senate's Select Committee on Intelligence.  Prior to his election to the Senate, Wyden served in the House of Representatives from 1981 to 1996.

*Amicus* Tom Malinowski is the United States Representative for New Jersey's 7th congressional district.  Prior to his election to Congress in 2018, Representative Malinowski served as a member of the State Department's Policy Planning Staff from 1994 to 1998, as senior director on the National Security Council at the White House from 1998 to 2001, as Washington Director for Human Rights Watch from 2001 to 2014, and as Assistant Secretary of State for Democracy, Human Rights and Labor from 2014 to 2017.

---

[1]  All parties have consented to the filing of this brief.  This brief was not authored in whole or in part by counsel for any party, and no person or entity other than *amici* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION

On October 2, 2018, Saudi Arabian author and journalist Jamal Ahmad Khashoggi was brutally murdered in the Saudi Arabian consulate in Istanbul, Turkey.  His assassins subsequently dismembered his corpse and smuggled it out of the consulate in an attempt to cover up the crime.  Public reports suggested that Mr. Khashoggi, then a U.S. resident, was lured out of the U.S. by Saudi officials in Washington and murdered at the behest of high-ranking officials of the Saudi Arabian government for the express purpose of silencing him as a critic of the Saudi regime.  Following the killing, American intelligence agencies investigated how the assassination took place and who directed it—an investigation whose ultimate goals should have been to seek justice for Mr. Khashoggi and to prevent further egregious political assassinations, in particular of American residents.

Justice Brandeis famously said, "sunlight is the best disinfectant," and the Freedom of Information Act ("FOIA") codifies that sentiment, requiring government records to be made available unless one of the narrow statutory exemptions applies.  *See* 5 U.S.C. § 552(a)(3)(A), (b)(1)-(9).  But Defendant the Office of the Director of National Intelligence ("ODNI") has refused to allow the public to see its report setting forth the intelligence community's conclusions on the Khashoggi investigation, designating the report classified in its entirety.

This designation comes despite an explicit statutory requirement in the 2020 National Defense Authorization Act ("NDAA") that ODNI produce an unclassified report on the parties responsible for Mr. Khashoggi's murder, reflecting congressional views that such disclosure was in the public interest.  As *amicus* Representative Malinowski explained in support of the disclosure, "[t]here is no justification for keeping this information" secret except "[p]rotecting the government and leadership of Saudi Arabia from embarrassment"—a statutorily illegitimate "reason for classification."  *See* The Administration's Inaction on the Killing of Jamal

Khashoggi, Press Conference (Mar. 3, 2020) at 13:55-18:02, https://bit.ly/2WTfolO ("Mar. 3 Press Conference Tr.").  The "information [] is highly relevant to the debate that we need to be having in this country about our relationship with Saudi Arabia"—"a debate that needs to take place with public input."  Mar. 3 Press Conference Tr. at 13:55-18:02.

Despite the significant public interest and express legislative requirement, ODNI has resisted Congress's efforts to shine light on the facts surrounding Mr. Khashoggi's assassination and has thereby impeded the efforts to seek justice, claiming secrecy is needed because of amorphous "national security" interests.  ODNI's contention, however, is fundamentally flawed. *Amici*—who have decades of national security experience—have personally read the report and can attest to the fact that ODNI can release the names of those responsible for the killing without *any* risk to national security.  Congress precisely intended and expected the public to be able to view such a report when it enacted the 2020 NDAA—the relevant provisions of which *amici* themselves authored and advocated for in their respective chambers of Congress.  Indeed, Congress reinforced its support of disclosure in the recently enacted Consolidated Appropriations Act of 2021, which enacted into law the "strong bipartisan conviction . . . that ensuring full accountability" for Mr. Khashoggi's murder is "in the public interest."  Pub. L. No. 116-260, § 625(a)(1) (2020).  Congress further clarified in the statute's text that the Director "should reasonably have been able to produce an unclassified report . . . as required, without putting sources and methods at risk," and that the failure to do so was "[c]ontrary to the unambiguous and lawful command of Congress."  *Id.* § 625(a)(6), (b).

Federal law, as passed by Congress and signed into law by President Trump, must be respected.  Plaintiff's request pursuant to FOIA that the Khashoggi report at issue in this case be publicly disclosed should be granted for two critical reasons.

*First*, ODNI's contention that these records should be withheld in full is utterly flawed and based on no credible national security risk.  As set forth above, *amici* can attest that disclosure of the report presents no discernible risk to national security.  *Amici* have decades of experience in the fields of national security, diplomacy, and intelligence oversight.  For those reasons, not only are *amici* sensitive to the importance of protecting the secrecy of intelligence sources and methods but *amici* can also assure the Court that granting Plaintiffs' request and, in particular, disclosing the names of Saudi officials involved in Khashoggi's killing, would in no way undermine American intelligence or security interests.  ODNI's conclusory assertions to the contrary are unsupported by the ODNI report itself and entitled to no deference.

*Second*, ODNI's continued refusal to declassify the report contradicts the express will of Congress as enacted in the 2020 NDAA.  *Amici* themselves drafted sections 1277 and 1574 of the NDAA, which explicitly call for the disclosure of an *unclassified* report about the Khashoggi murder that identifies those involved in the killing.  Congress's desire for transparency and accountability is also evident in the legislative history of sections 1277 and 1574.  Permitting ODNI to withhold the report and the names of the Saudi officials involved in Mr. Khashoggi's death would run counter to the congressional intent behind the NDAA provisions.

In short, this Court should order ODNI to disclose the information Plaintiffs seek and to allow the American people to view information critical to important matters of public concern. As Representative Malinowski explained, "I cannot think of another example, in decades, of when the Executive branch has classified information to deny the public knowledge of who was responsible for a human rights abuse"—information that is "highly relevant" to the public's assessment of the United States' ongoing relationship with the Saudi Arabian government.  Mar. 3 Press Conference Tr. at 13:55–18:02.  Senator Wyden similarly emphasized his hope that the

intelligence community would "finally adhere[] to the intent of the provision[s]" and "tell[] the American people and the world what it knows about the death of Mr. Khashoggi." 165 Cong. Rec. S4472 (daily ed. June 24, 2019) (statement of Sen. Wyden).

As the government concedes, "FOIA represents a balance struck *by Congress* 'between the right of the public to know and the need of the Government to keep information in confidence.'" Mem. of Law in Support of the Office of the Director of National Intelligence's Mot. For Summ. J, Dkt. 18 ("Gov't Br."), at 5 (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)) (emphasis added). *Amici* write as members of Congress to clarify the balance that has in fact been struck and how that balance tilts firmly in favor of disclosure of the ODNI report at issue and to urge this Court to order ODNI to disclose the records to Plaintiffs and to the American public.

## ARGUMENT

FOIA requires that government records be made available to the public unless a statutory exemption applies. *See* 5 U.S.C. § 552(a)(3)(A), (b)(1)-(9). As Congress and the courts have repeatedly emphasized, FOIA is designed to "establish a general philosophy of full agency disclosure," S. Rep. No. 89-813, at 3 (1965), and "to assure the availability of Government information necessary to an informed electorate," H.R. Rep. No. 89-1497, at 12 (1966). In light of this purpose, "FOIA exemptions are to be construed narrowly." *Assoc. Press v. U.S. Dep't of Def.*, 554 F.3d 274, 283 (2d Cir. 2009). The "strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *Id.* (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). The agency's failure to meet that burden requires disclosure of the requested documents, *see Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 355–56 (2d Cir. 2005), and "all doubts as to the applicability of the exemption

[asserted by the agency] must be resolved in favor of disclosure," *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009).

As justification for resisting disclosure, ODNI invokes FOIA's Exemption 1 and Exemption 3.  Exemption 1 permits an agency to withhold information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and "properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  Executive Order 13,526, which ODNI has invoked here, lays out the requirements for proper classification and provides that certain categories of information, including "intelligence activities (including covert action)," "intelligence sources and methods," and "foreign relations or foreign activities of the United States," are properly classified if and only if the agency can demonstrate that "disclosure of the information could reasonably be expected to cause identifiable or describable damage to the national security."  Exec. Order 13,526, 75 Fed. Reg. 707, 707–09 (Dec. 29, 2009).  The burden is on the agency to "logically" and "plausibl[y]" demonstrate that disclosure of the report reasonably could be expected to result in damage to U.S. national security.  *See Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009).

Exemption 3 permits an agency to withhold information "specifically exempted from disclosure by statute," if the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A).  ODNI bases its Exemption 3 withholding on Section (i)(1) of the National Security Act, which provides that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  In order to justify withholding under

Exemption 3, the agency must demonstrate that the materials withheld fall within the scope of the statute. *See, e.g.*, *CIA v. Sims*, 471 U.S. 159, 167 (1985).

Neither exemption properly applies here. *First*, *amici* personally can confirm that disclosure of the findings and names of responsible parties in the report would not risk or harm national security, rendering futile ODNI's invocation of Exemption 1. *Amici* have read the very documents at issue and have the experience to assess whether publication of the names of responsible parties identified in the ODNI report would reveal intelligence sources or methods. Put simply, it would not. *Second*, *amici* can confirm that application of Exemption 3 is unwarranted where Congress itself has directly spoken on this specific disclosure issue—through provisions of law *amici* themselves drafted—confirming not only that federal law does not stand in the way of disclosure, but mandates it.

## I.     Disclosure of the ODNI Report Would Not Compromise National Security or Reveal Intelligence Sources or Methods

ODNI's invocations of Exemptions 1 and 3 largely revolve around the same argument: That the disclosure sought —and particularly the details of who ordered Mr. Khashoggi's assassination—would harm national security.  That is manifestly wrong, not only because so much about the Khashoggi murder is already public but also because *amici* have reviewed the relevant documents and know personally that ODNI's invocations of national security cannot cut the mustard.

In light of the extensive reporting on the Khashoggi murder by governments around the world, international organizations, and news outlets, it is neither "logical" nor "plausible" that wholesale withholding of the findings in the report—including, notably, the identities of the responsible parties—is necessary to protect intelligence sources and methods. *See, e.g.*, *N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 119–120 (2d Cir. 2014) (holding that, based on

public disclosures and public statements by public officials, it was "no longer either 'logical' or 'plausible' to maintain that disclosure" of an Office of Legal Counsel memorandum on the lawfulness of targeted drone strikes "risks disclosing any aspect of 'military plans, intelligence activities, sources and methods, and foreign relations'").  For example, on November 15, 2018, the U.S. Treasury's Office of Foreign Assets Control (OFAC) imposed sanctions on 17 Saudi individuals who, as Secretary Steven Mnuchin explained "were involved in the abhorrent killing of Jamal Khashoggi" and who "must face consequences for their actions."[2]  Around the same time, prominent media outlets reported on CIA conclusions that Saudi Crown Prince Mohammed bin Salman personally ordered Khashoggi's assassination.[3]  Shortly after, in December 2018, the Senate passed a resolution condemning the murder of Jamal Khashoggi, stating "that the Senate [] believes Crown Prince Mohammed bin Salman is responsible for the murder of Jamal Khashoggi" and noting that 17 Saudi individuals had been sanctioned for their roles in the murder.  S.J. Res. 69, 115th Cong. (as passed by Senate, Dec. 13, 2018).  Finally, in June 2019, the United Nations Special Rapporteur on extrajudicial, summary or arbitrary killings issued a 99-page report on the execution of Khashoggi, which listed the names of those suspected of involvement and noted that "the names of (at least) 19 persons" involved in the murder "have

---

[2]  *See* Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions 17 Individuals for Their Roles in the Killing of Jamal Khashoggi* (Nov. 15, 2018), https://home.treasury.gov/news/press-releases/sm547.

[3]  See Shane Harris, Greg Miller & Josh Dawsey, *CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi's Assassination*, WASH. POST (Nov. 16, 2018), https://www.washingtonpost.com/world/national-security/cia-concludes-saudi-crown-prince-ordered-jamal-khashoggis-assassination/2018/11/16/98c89fe6-e9b2-11e8-a939-9469f1166f9d_story.html.

been disclosed by Turkish documents as well as the US and Canadian Sanctions Lists," among others.[4]

In short, the notion that release of the responsible parties' names would harm American interests is belied by the fact that many names have already been disclosed in a variety of unclassified sources—a point that Congress itself made just weeks ago, when it *again* demanded disclosure in the Consolidated Appropriations Act: "The evident belief of the Director that no unclassified information can be produced in accordance with the directives of Congress is dubious, in light of the extensive body of credible, unclassified reporting available regarding the murder of Mr. Khashoggi, and the roles and culpability of officials at the highest levels of the Government of Saudi Arabia." *See* Pub. L. No. 116-260, § 625(a)(7).

Despite the mass of public information already available, ODNI insists that this Court should simply defer to the conclusion of ODNI declarant Gregory Koch, director of ODNI's Information Management Office, that the record withheld is properly classified intelligence information whose release would "reveal details of the [Intelligence Community's] collection efforts, or lack thereof." Declaration of Gregory M. Koch, ECF No. 18, at ¶ 24. Whatever deference to which agency affidavits may sometimes be entitled in the national security context, deference is not warranted where, as here, the agency's assertions are entirely conclusory[5]—and,

---

[4]  Annex to the Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions: Investigation into the Unlawful Death of Mr. Jamal Khashoggi at ¶ 50 (June 19, 2019), A/HRC/41/CRP.1, *available at* https://www.ohchr.org › Documents › A_HRC_41_CRP.1.docx.

[5]  The agency's sole deponent, Gregory M. Koch, did little more than assert conclusorily that "disclosure of additional details surrounding Mr. Khashoggi's murder would undermine U.S. intelligence sources and methods," ostensibly because disclosure of any further information about the records withheld would itself reveal classified information. Koch Decl., at ¶ 18 (quoting a July 2020 letter from the DNI to the Chairman and Vice Chairman of the Senate Select Committee on Intelligence). But if additional details contained in classified materials would justify the withholding of the two-page ODNI report, the Government should have

more importantly, are belied by the ODNI report itself, which *amici* have personally reviewed.

Based on *amici*'s review of the record at issue, it is simply not the case that "all information in

the withheld record relates to intelligence sources and methods."  Koch Decl., at ¶ 27.  In fact,

the core element of the report—a listing of responsible parties—is *ipso facto* an intelligence

assessment, which is derived from, rather than constitutive of, the raw intelligence whose

disclosure could potentially reveal sources and methods.  Pursuant to the National Defense

Authorization Act, the classified ODNI report was delivered to Congress (one month late) in

February 2020.  *Amici* attest, with the benefit of decades of experience in national security and

intelligence oversight, that it does not merit classification, and that release of the report, with

limited redactions as may be required, would in no way harm American security interests.

      *Amici* are not alone.  Members of Congress on both sides of the aisle who have reviewed

the report have pushed back on ODNI's wholesale classification and withholding of it from the

public.  House Intelligence Committee Chairman Adam Schiff, for example, wrote a letter to

Acting ODNI Director Richard Grenell stating that "after reviewing the classified annex, the

Committee believes that the annex could be declassified with appropriate redactions that should

not alter or obscure in any way the Intelligence Community's determinations, presentation of

evidence, or identification of relevant persons, as required by law."[6]  Rep. Schiff observed that

---

filed a classified declaration.  *See, e.g.*, *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1385 (D.C. Cir. 1979) (noting that, where "detailed justification would compromise legitimate secrecy interests," the "proper procedure" is for the agency to submit an affidavit for review in camera).  Tellingly, ODNI has not done so, because no additional information could properly justify classification in full.

[6] Letter from Rep. Adam Schiff, Chairman, Permanent Select Intelligence Committee on Intelligence, U.S. House of Representatives, to Richard Grenell, Acting Director, Office of the Director of National Intelligence (Feb. 27, 2020), *available at* Zachary Halaschak, *Adam Schiff Asks Acting Spy Chief Richard Grenell to Declassify Documents Related to Khashoggi Killing* (Feb. 27, 2020), https://www.washingtonexaminer.com/news/adam-schiff-asks-acting-spy-chief-richard-grenell-to-declassify-documents-related-to-khashoggi-killing.

he did not "foresee that any harm to U.S. national security would result from immediately declassifying the findings contained in DNI's classified annex with redactions as necessary," and that "[f]ailure to declassify the annex and produce an unclassified report could give rise to concerns that ODNI is using the classification process impermissibly in order to shield information of intense public interest from public release."[7]  The leadership of the Senate Select Committee on Intelligence also sent a letter expressing concerns over ODNI's compliance with sections 1277 and 5714.[8]  More recently, both houses of Congress reaffirmed their collective belief that ODNI could provide an unclassified report without jeopardizing intelligence sources and methods.  *See* Pub. L. No. 116-260, § 625(b).

*Amicus* Senator Wyden also took to the Senate Floor following ODNI's release to Congress of the classified report to observe that "[t]he absence of transparency and accountability for [Khashoggi's] murder sends a horrible message – that as far as the Trump administration is concerned, it's open season on journalists," and to insist that "it is time for the American people, the Congress and everyone around the world fighting for press freedom to see the reports."[9]  And, on March 2, 2020, *amici* held a press conference together condemning the administration's refusal to publicly release details on the killing of Jamal Khashoggi.  Mar. 3 Press Conference Tr.  In his remarks, Rep. Malinowski emphasized the extraordinarily "high

---

[7]  *Id.*

[8]  *See* Koch Decl., Ex. B (Letter from Director of National Intelligence John Ratcliffe to Acting Senate Intelligence Committee Chairman Marco Rubio and Vice Chairman Mark Warner acknowledging their "concerns about ODNI's compliance with Sections 1277 and 5714").

[9]  Press Release, Sen. Ron Wyden, *If the Intelligence Community Won't Release Report on Murder of U.S.-Based Journalist, Congress Must Release It* (June 24, 2019), https://www.wyden.senate.gov/news/press-releases/-wyden-if-the-intelligence-community-wont-release-report-on-murder-of-us-based-journalist-congress-must-release-it-.

degree of bipartisan consensus" around the need for transparency and put the lie to ODNI's

contention that the report is properly classified:

> I can tell you that that report contains information that is ***highly
> relevant to the debate that we need to be having in this country
> about our relationship with Saudi Arabia.*** And that is a debate that
> ***needs to take place with public input*** and that is another reason why
> this needs to be de-classified. There is ***no justification for keeping
> this information secret.*** Protecting the American people, denying
> the American people the opportunity to have a public debate on this
> question is absolutely not a legitimate reason to classify this
> information. ***Protecting the government and leadership of Saudi
> Arabia from embarrassment is not a legitimate reason for
> classification.*** In fact, in my many years of experience working on
> human rights and national security issues, a little bit in the Congress,
> more in the Executive branch and in the human rights community, ***I
> cannot think of another example, in decades, of when the
> Executive branch has classified information to deny the public
> knowledge of who was responsible for a human rights abuse.*** That
> is absolutely, under the law, not a reason to classify something.

Mar. 3 Press Conference Tr. at 13:55–18:02 (emphasis added).  Senator Wyden, for his part,

observed:

> Last December, the Congress passed the Intelligence Authorization
> Act, which included a provision I authored requiring a public,
> unclassified report from the Director of National Intelligence
> identifying who carried, out, who participated in, and who ordered
> or was otherwise complicit or responsible for Jamal Khashoggi's
> killing. . . . [T]he Director of National Intelligence said they
> wouldn't provide any unclassified information. This is essentially
> 180 degrees from what a public law requires. . . . The law was very
> specific about what needs to be public and the information I am
> seeking to be released is consistent in all particulars with this
> requirement.

Mar. 3 Press Conference Tr. at 8:20–13:34.

   *Amici* take very seriously the national security of the United States and the intelligence

community's obligation to protect intelligence sources and methods.  Senator Wyden has served

for two decades on the Senate Select Committee on Intelligence, which oversees federal

intelligence agencies and bureaus.  Rep. Malinowski has served on the National Security Council

as Assistant Secretary of State, and currently sits on the House Committee on Foreign Affairs, which is responsible for oversight and legislation relating to national security developments affecting foreign policy, among other issues, and on its Subcommittee on Middle East, North Africa, and International Terrorism.  But here, ODNI's decision to classify the report of Saudi officials' involvement in the murder of Jamal Khashoggi smacks of a political cover-up, discounting the horror of a U.S. resident being killed with impunity to save the Saudi Arabian leadership from embarrassment.  This Court should not permit that cover-up to continue for one more day.

Because ODNI's conclusory invocations of "national security" are specious, ODNI's invocations of FOIA Exemptions 1 and 3 must fail, and this Court should require ODNI to disclose the documents and information Plaintiffs seek, including disclosure of the names of Saudi officials responsible for Khashoggi's death.  Disclosure of this information would not foreseeably harm U.S. national security or reveal protected intelligence sources or methods, as required for Exemptions 1 or 3 to apply.

## II.      Disclosure Comports with Congressional Intent

Wholesale withholding of the report is not justified by any national security or intelligence interest and also flatly contradicts congressional directive, rendering ODNI's invocation of Exemption 3 meritless.  Unlike other FOIA exemptions, which afford executive agencies some discretion to determine what records may be released, Exemption 3 "require[s] that Congress, not the agencies of the Executive Branch, determine the need for nondisclosure." *Wisconsin Project on Nuclear Arms Control v. U.S. Dep't of Commerce*, 317 F.3d 275, 280 (D.C. Cir. 2003); *accord Irons & Sears v. Dann*, 606 F.2d 1215, 1220 (D.C. Cir. 1979) ("Congress intended exemption from the FOIA [under Exemption 3] to be a legislative determination and

13

not an administrative one.").  Information may be withheld under Exemption 3 only where there is clear "evidence [of] a congressional determination that certain materials ought to be kept in confidence." *Irons & Sears*, 606 F.2d at 1220.  Moreover, to qualify as a withholding provision, a statute must be "the product of congressional appreciation of the dangers inherent in airing particular data." *Am. Jewish Cong. v. Kreps*, 574 F.2d 624, 628–29 (D.C. Cir. 1978).

ODNI's case for withholding disregards entirely the 2020 NDAA's provisions requiring disclosure of the specific information at issue—provisions that were the product of an unusually bipartisan process reflecting the serious desire Congress had for transparency.[10]  Congressional calls for transparency started on November 27, 2018, just weeks after Mr. Khashoggi was killed, when Senator Wyden introduced a bill "to require the Director of National Intelligence to submit to Congress a report on the death of Jamal Khashoggi."  S. 3658, 115th Cong. (2018).  Senator Wyden reintroduced the bill on February 25, 2019.  S. 544, 116th Cong. (2019).

The calls for transparency continued.  On May 14, 2019, for instance, the Senate Intelligence Committee met to consider the Damon Paul Nelson and Matthew Young Pollard Intelligence Authorization Act for Fiscal Years 2018, 2019, and 2020 ("Intelligence Authorization Act").  S. Rep. No. 116-47, at 53–54 (2019).  Senator Wyden offered an amendment requiring "an unclassified report on the death of Jamal Khashoggi." *Id.* at 54.  By voice vote, the Committee adopted a modification to Senator Wyden's amendment put forward by Senator Susan Collins, to add the phrase "consistent with protecting sources and methods."

---

[10]  Under "the ancient interpretive principle that the specific governs the general (generalia specialibus non derogant)" when it comes to "laws of equivalent dignity," *Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 21 (2012), the congressional amendment that speaks directly to disclosure of the records at issue is the relevant statute for Exemption 3 purposes and requires disclosure.

*Id.*  By a vote of 15-0, the Committee adopted Senator Wyden's amendment with Senator

Collins's modification and voted to report the bill to the full Senate.  *Id.* at 55.

Days later, the Intelligence Authorization Act was reported to the full Senate, containing

the following provision:

> Not later than 30 days after the date of the enactment of this Act, the Director of National Intelligence shall submit to Congress a report on the death of Jamal Khashoggi, consistent with protecting sources and methods. Such report shall include identification of those who carried out, participated in, ordered, or were otherwise complicit in or responsible for the death of Jamal Khashoggi.

S. 1589, 116th Cong. § 410(a) (2019).  Critically, as the provision's second sentence indicates,

the Senate Intelligence Committee believed that requiring ODNI to identify "those who carried

out, participated in, ordered, or were otherwise complicit in or responsible for the death of Jamal

Khashoggi" was consistent with protecting sources and methods.  And the Senate Intelligence

Committee in no way suggested that a fully classified report or annex would satisfy the law or

that the "sources and methods" language was license to ignore the amendment entirely.  On the

contrary, the Khashoggi amendment, as unanimously adopted by the Committee, was "intended

to ensure that there is transparency and accountability for the Saudi murder of a U.S. resident and

journalist," as Senator Wyden explained in the Senate Intelligence Committee's June 11, 2019

report on the Intelligence Authorization Act.  S. Rep. No. 116-47, at 56 (2019).

Meanwhile, in the House of Representatives, Rep. Malinowski introduced the Saudi

Arabia Human Rights and Accountability Act (SAHRAA) on April 2, 2019.  H.R. 2037, 116th

Cong. (2019).  Among other measures intended "[t]o encourage accountability for the murder of

Washington Post columnist Jamal Khashoggi," the SAHRAA required ODNI to submit a report

consisting of (1) evidence about the advance knowledge and role of any Saudi official in the

Khashoggi killing, and (2) a list of foreign persons that ODNI believed were responsible for or

complicit in Khashoggi's death or who impeded the impartial investigation into his murder.  *See id*. § 2(a).  During his floor remarks, Rep. Malinowski stressed the importance of "nam[ing] and hold[ing] accountable those who are responsible for the killing of Jamal Khashoggi," explaining that his bill would require ODNI to provide "a list of *everyone*, *without exception*, whom the intelligence community believe[d] to be responsible for planning, executing or covering up this terrible crime."  165 Cong. Rec. H5799 (daily ed. July 15, 2019) (statement of Rep. Malinowski) (emphasis added).  Significantly, the SAHRAA passed in the House by an overwhelming majority: 405 Representatives voted in favor, while only 7 opposed.  *See* 165 Cong. Rec. H5814 (daily ed. July 15, 2019).

The relevant provisions in both the SAHRAA and the Intelligence Authorization Act ultimately found their way into the 2020 NDAA, which the President signed into law on December 20, 2019.  Pub. L. No. 116-92, §§ 1277, 5714 (2019).  *See* Appendix A.  Specifically, Section 1277 required ODNI to submit to Congress within 30 days a detailed report that identified Saudi Arabian officials involved in the killing of Mr. Khashoggi, including a list of persons "responsible for, or complicit in, ordering, controlling, or otherwise directing" the murder, as well as anyone who "knowingly and materially assisted, sponsored, or provided financial, material, or technological support," or who "impeded the impartial investigation" of the murder.  *Id*. § 1277.  Section 1277 expressly required the report to be "unclassified," and required the "name of each foreign person listed" to be "included in the unclassified section" unless ODNI "determine[d] that such disclosure would undermine "intelligence sources and methods."  *Id*.  Similarly, Section 5714 required the submission to Congress in "unclassified form" "a report on the death of Jamal Khashoggi, consistent with protecting sources and methods," that "shall include identification of those who carried out, participated in, ordered, or

were otherwise complicit in or responsible for the death of Jamal Khashoggi." *Id*. § 5714.  The

inclusion of these two provisions in the NDAA makes clear that Congress was concerned about

the administration's lack of transparency in connection with Khashoggi's murder and demanded,

at a minimum, that the names of those involved and the circumstances of the assassination be a

matter of public record.[11]

Notwithstanding the plain language in the NDAA requiring ODNI to produce a report to

Congress "[n]ot later than 30 days" after the December 20, 2019 enactment, *id*. §§ 1277, 5714,

ODNI flouted the deadline.  It failed to produce anything.  Eventually, on February 20, 2020,

after Senator Wyden's office pressed the agency to comply with the statutory mandate, ODNI

submitted to congressional leaders a *classified* report along with a two-paragraph letter stating

that the office could not provide any unclassified information whatsoever about Khashoggi's

death.  *See* Koch Decl., Ex. A.

A bipartisan group of legislators, including *amicus* Senator Wyden, wrote to ODNI,

objecting to its refusal to provide unclassified materials as federal law required and demanding

greater transparency.  *See* Koch Decl., Ex. B.  Notwithstanding this firm—and bipartisan—

pushback, ODNI has remained steadfast in its refusal to declassify any information whatsoever

about the death of Jamal Khashoggi.  To be sure, the NDAA provisions indicate that the records

at issue should be released "consistent with protecting sources and methods" or unless "such

disclosure would undermine United States intelligence sources and methods or threaten the

---

[11]  *See, e.g.*, Press Release, Rep. Tom Malinowski (Dec. 10, 2019),
https://malinowski.house.gov/media/press-releases/representative-malinowski-statement-
ndaa-deal ("I'm pleased that the conferees included a critical part of my Saudi Arabia Human
Rights Accountability Act, which passed the House by a vote of 405-7 in July. The NDAA
will require the Director of National Intelligence to provide Congress with a list of all Saudi
officials responsible for the murder of the journalist Jamal Khashoggi.")

national security interests of the United States." *See* Pub. L. No. 116-92, §§ 1277, 5714.  But

Congress plainly anticipated that substantial portions of the ODNI report, including specifically

the "identification of those who carried out, participated in, ordered, or were otherwise complicit

in or responsible for the death of Jamal Khashoggi," would be unclassified and made available to

the American public.  *See* Pub. L. No. 116-92, §§ 1277, 5714.  That was the point of the law.

The legislative history of the two NDAA provisions that *amici* authorized and shepherded

through the legislative process demonstrates that Congress believed—and continues to believe—

that the American public deserves a conclusive and public determination of who was responsible

for the murder of a U.S. journalist.  Contrary to ODNI's unsubstantiated suggestion that

disclosure is not in the public interest, *see* Gov't Br. at 5, Congress's determination that the

names of persons responsible ought to be released itself establishes that the public interest favors

disclosure.  Lest there be any doubt, the Consolidated Appropriations Act avowed "that ensuring

full accountability for the brutal murder on October 2, 2018, of Jamal Khashoggi, a former

Washington Post columnist and resident of the United States, is in the public interest and also the

national interest of the United States."  Pub. L. No. 116-260, § 625(a)(1).

In order to invoke Exemption 3, ODNI would have to prove "congressional intent" to

keep the circumstances of Mr. Khashoggi's murder a secret from the American people, *see, e.g.*,

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 765 (1989)—

but it cannot do so because the congressional intent here was indisputably to require disclosure

of information about Mr. Khashoggi's murder.  *See Am. Jewish Cong.*, 574 F.2d at 628–29.

And, again, just weeks ago, Congress reiterated its demand for an unclassified report and clearly

stated its belief that such reports could be produced without revealing intelligence sources and

18

methods.  *See* Pub. L. No. 116-260, § 625.  Accordingly, ODNI cannot sustain its burden and may not seek refuge in Exemption 3.

* * *

In sum, ODNI has not shown, and cannot show, that harm to national security or intelligence sources and methods would foreseeably result from immediate public disclosure of the report, particularly if ODNI is permitted to make limited redactions to sourcing statements or references to secret intelligence techniques as necessary to preserve the secrecy of anything that may legitimately be called an intelligence source or method.  It is well-established that a federal agency must bear the burden of justifying withholding with more than blanket assertions and conclusory rationales, *see, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1096 (D.C. Cir. 2014), and must always "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible," and "take reasonable steps necessary to segregate and release nonexempt information," 5 U.S.C. § 552(a)(8)(ii).  This is true "even in a national security context."  *Ray v. Turner*, 587 F.2d 1187, 1197 (D.C. Cir. 1978).  ODNI has not even come close to showing what it must in order to justify concealing from the American people the circumstances of the brutal murder and dismemberment of U.S. resident and journalist Jamal Khashoggi by foreign governmental actors.  This Court should not delay and should award Plaintiffs the relief they seek and the transparency and public accountability Congress has long mandated.

**CONCLUSION**

For the foregoing reasons, this Court should order ODNI to promptly disclose records responsive to Plaintiff's FOIA request.

Respectfully submitted,

Date: January 13, 2021

/s/ Anne Champion
Anne Champion
Lee R. Crain
Alexandra Perloff-Giles
Jabari Julien (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Telephone: (212) 351-5361
Email: achampion@gibsondunn.com
Email: lcrain@gibsondunn.com
Email: aperloff-giles@gibsondunn.com

*Counsel for Amici Curiae Senator Ron*
*Wyden and Representative Tom Malinowski*

**Appendix A**:
**National Defense Authorization Act for Fiscal Year 2020**
**Pub. L. No. 116-92, §§ 1277, 5714**

SEC. 1277. REPORT ON INTELLIGENCE COMMUNITY ASSESSMENT RELATING TO
        THE KILLING OF WASHINGTON POST COLUMNIST
        JAMAL KHASHOGGI.

  (a) In General.--Not later than 30 days after the date of the
enactment of this Act, the Director of National Intelligence shall
submit to the appropriate congressional committees a report consisting
of--
        (1) <<NOTE: Determination.>>  a determination and
    presentation of evidence with respect to the advance knowledge
    and role of any current or former official of the Government of
    Saudi Arabia or any current or former senior Saudi political
    figure over the directing, ordering, or tampering of evidence in
    the killing of Washington Post columnist Jamal Khashoggi; and
        (2) <<NOTE: List.>>  a list of foreign persons that the
    Director of National Intelligence has high confidence--
            (A) were responsible for, or complicit in, ordering,
        controlling, or otherwise directing an act or acts
        contributing to or causing the death of Jamal Khashoggi;
            (B) knowingly and materially assisted, sponsored, or
        provided financial, material, or technological support
        for, or goods or services in support of, an activity
        described in subparagraph (A); or
            (C) impeded the impartial investigation of the
        killing of Jamal Khashoggi, including through the
        tampering of evidence relating to the investigation.

  (b) Form.--
        (1) In general.--The report required by subsection (a) shall
    be submitted in unclassified form, but may include a classified
    annex.
        (2) <<NOTE: Determination.>>  Names of foreign persons
    listed.--The name of each foreign person listed in the report
    described in subsection (a)(2) shall be included in the
    unclassified portion of the report unless the Director of
    National Intelligence determines that such disclosure would
    undermine United States intelligence sources and methods or
    threaten the national security interests of the United States.

  (c) Defined.--In this section:
        (1) Appropriate congressional committees.--The term

21

``appropriate congressional committees'' means--
>    (A) the Committee on Foreign Affairs and the
> Permanent Select Committee on Intelligence of the House
> of Representatives; and
>    (B) the Committee on Foreign Relations and the
> Select Committee on Intelligence of the Senate.
  (2) Knowingly.--The term ``knowingly'', with respect to
conduct, a circumstance, or a result, means that a person has
actual knowledge, or should have known, of the conduct, the
circumstance, or the result.

## SEC. 5714. REPORT ON DEATH OF JAMAL KHASHOGGI.

  (a) In General.--Not later than 30 days after the date of the
enactment of this Act, the Director of National Intelligence shall
submit to Congress a report on the death of Jamal Khashoggi, consistent
with protecting sources and methods. Such report shall include
identification of those who carried out, participated in, ordered, or
were otherwise complicit in or responsible for the death of Jamal
Khashoggi.

  (b) Form.--The report submitted under subsection (a) shall be
submitted in unclassified form.

## Appendix B:
### Consolidated Appropriations Act, 2021
### Pub. L. No. 116-260, § 625

SEC. 625. SENSE OF CONGRESS ON REPORT ON MURDER OF JAMAL KHASHOGGI.

(a) Findings.--Congress finds the following:

(1) There is a strong bipartisan conviction, shared widely throughout the legislative and executive branches of the United States Government and elsewhere, that ensuring full accountability for the brutal murder on October 2, 2018, of Jamal Khashoggi, a former Washington Post columnist and resident of the United States, is in the public interest and also the national interest of the United States.

(2) Section 5714 of the Damon Paul Nelson and Matthew Young Pollard Intelligence Authorization Act for Fiscal Years 2018, 2019, and 2020 (division E of Public Law 116-92; 133 Stat. 2173) required the Director of National Intelligence to submit to Congress a written report in ``unclassified form'' that includes ``identification of those who carried out, participated in, ordered, or were otherwise complicit in or responsible for the death of Jamal Khashoggi.''.

(3) Section 1277 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116-92; 133 Stat. 1701) likewise obligated the Director to submit to the Committee on Foreign Affairs and the Permanent Select Committee on Intelligence of the House of Representatives and the Committee on Foreign Relations and the Select Committee on Intelligence of the Senate a written report on the assessment of the intelligence community regarding Mr. Khashoggi's brutal murder.

(4) Such section 1277 specifically called, among other things, for a determination and presentation of evidence with respect to the advance knowledge and role of any current or former official of the Government of Saudi Arabia or any current or former senior Saudi political figure over the directing, ordering, or tampering of evidence in relation to Mr. Khashoggi's murder.

(5) Such section 1277 also required the Director to submit a list of foreign persons whom the Director has high confidence were responsible for, complicit in, or otherwise knowingly and materially assisted the murder, or impeded its impartial

investigation, or who ordered or otherwise directed an act or acts contributing to or causing the murder.

(6) Contrary to the unambiguous and lawful command of Congress under such sections 5714 and 1277, the Director did not produce any unclassified report as required by either such section, and instead, on February 20, 2020, the Director submitted to such committees a classified report, which the Director referred to as an ``annex''.

(7) The evident belief of the Director that no unclassified information can be produced in accordance with the directives of Congress is dubious, in light of the extensive body of credible, unclassified reporting available regarding the murder of Mr. Khashoggi, and the roles and culpability of officials at the highest levels of the Government of Saudi Arabia.

(b) Sense of Congress.--It is the sense of Congress that the Director of National Intelligence should reasonably have been able to produce an unclassified report pursuant to section 5714 of the Damon Paul Nelson and Matthew Young Pollard Intelligence Authorization Act for Fiscal Years 2018, 2019, and 2020 and section 1277 of the National Defense Authorization Act for Fiscal Year 2020 that did not alter or obscure, in any way, the intelligence community's core determinations, its presentation of evidence, or identification of relevant persons, as required, without putting sources and methods at risk.