**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OPEN SOCIETY JUSTICE INITIATIVE, | CASE NO. 1:20-CV-06625-PAE |
| Plaintiff, | JUDGE PAUL A. ENGELMAYER |
| vs. | |
| OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, | |
| Defendant. | |

**BRIEF OF DEMOCRACY FOR THE ARAB WORLD NOW AS *AMICUS CURIAE***

# TABLE OF CONTENTS

Interest Of *Amicus Curiae* ..........................................................................................1

Introduction...................................................................................................................2

Argument ......................................................................................................................3

    A.  Background, Purpose, And Intent Of FOIA. ....................................................3

    B.  FOIA Exemptions 1 And 3 Are Not Rubber Stamps.......................................4

    C.  Evidence Of Bad Faith Supports Denying ODNI's Summary Judgment Motion. ..............7

    D.  Disclosure Of The NICM Is Consistent With The Goals Of FOIA And In The Public Interest. .................................................................................................16

    E.  In The Alternative, The Court Should Review The NICM *In Camera*. ...........................18

Conclusion ..................................................................................................................19

# TABLE OF AUTHORITIES

**CASES**

*ACLU v. United States Dep't of Defense*,
   901 F.3d 125 (2d Cir. 2018)..................................................................................... 5

*Arieff v. United States Dep't of the Navy*,
   712 F.2d 1462 (D.C. Cir. 1983) .............................................................................. 18

*Campbell v. United States Dep't of Justice*,
   164 F.3d 20 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999).................................. 6, 8

*Carney .v United States Dep't of Justice*,
   19 F.3d 807 (2d Cir. 1994)....................................................................................... 6

*Ctr. for Nat. Sec. Studies v. United States Dep't of Justice*,
   331 F.3d 918 (D.C. Cir. 2003) ................................................................................. 5

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976)................................................................................................. 3

*Donovan v. Federal Bureau of Investigation*,
   806 F.2d 55 (2d Cir. 1986)....................................................................................... 4

*EPA v. Mink*,
   410 U.S. 73 (1973)................................................................................................... 3

*Grand Cent. P'ship v. Cuomo*,
   166 F.3d 473 (2d Cir. 1999)..................................................................................... 5

*Halpern v. Federal Bureau of Investigation*,
   181 F.3d 279 (2d Cir. 1999)................................................................................ 4, 18

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)..................................................................................................... 5

*Jones v. FBI*,
   41 F.3d 238 (6th Cir. 1994) ..................................................................................... 6

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ................................................................................. 6

*Lawyers Comm. for Human Rights v. I.N.S.*,
   721 F. Supp. 552 (S.D.N.Y. 1989) ...................................................................... 4, 18

*Local 3, Int'l Bhd. of Elec. Workers, AFL–CIO v. NLRB*,
   845 F.2d 1177 (2d Cir. 1988)................................................................................. 18

*Mead Data Cent., Inc. v. United States Dep't of the Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) ................................................................................. 4

*Milner v. Dep't of Navy*,
   562 U.S. 562 (2011)................................................................................................. 3

*N.L.R.B. v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978)................................................................................................. 3

*Physicians for Human Rights v. United States Dep't of Def.*,
   675 F. Supp. 2d 149 (D.D.C. 2009) ........................................................................... 18

*United States Dep't of Justice v. Tax Analysts*,
   492 U.S. 136 (1989) ................................................................................................... 3

*Williams v. McCausland*,
   Nos. 90-cv-7563, 91-cv-7281. 1994 WL 18510 (S.D.N.Y. Jan. 18, 1994) ............... 4

*Wilner v. Nat'l Sec. Agency*,
   592 F.3d 60 (2d Cir. 2009) ..................................................................................... 5, 6

**STATUTES**

5 U.S.C. § 1002 (1964 ed.) .............................................................................................. 3

5 U.S.C. § 552 ............................................................................................................. 3, 5

Global Magnitsky Human Rights Accountability Act,
   Pub. L. No. 114-328, § 1263(d)(1), 130 Stat. 2533, 2534 (Dec. 23, 2016) ........... 15

Democracy for the Arab World Now ("DAWN") respectfully submits this brief as *amicus curiae* in support of Plaintiff Open Society Justice Initiative ("OSJI")'s cross-motion for summary judgment and in opposition to Defendant Office of the Director of National Intelligence ("ODNI")'s motion for summary judgement.

## INTEREST OF *AMICUS CURIAE*

Journalist and dissident Jamal Khashoggi, together with a group of like-minded friends, founded DAWN in January 2018, just months before Saudi Crown Prince Mohammed bin Salman masterminded the murder of Khashoggi at the Saudi Consulate in Istanbul.  Khashoggi served as DAWN's Executive Director at the time of his murder, and he made his mission DAWN's mission: to expose human rights violations and arbitrary and abusive practices by Middle East and North African governments, focusing on unjust prosecutions and the government officials responsible for them.

DAWN serves as an institutional base for political exiles from the Middle East, just as Khashoggi was, and provides them with a platform to share their views and debate democratic solutions to the region's problems freely, just as Khashoggi sought to do before his murder.  In performing its mission and shining a light on the misconduct of Middle Eastern and North African governments receiving military, diplomatic, and economic support from the United States government and other international public and private entities, DAWN seeks to convince those entities to uphold their human rights obligations and end that support.

Though Khashoggi did not live long enough to see DAWN accomplish its mission, Khashoggi's voice and vision live on through DAWN.  DAWN thus has a unique interest in ensuring that all those who planned, ordered, and executed its founder's murder are held accountable.  DAWN's interests stem not only from the fact that DAWN itself is prosecuting a civil lawsuit against bin Salman and his co-conspirators, *Cengiz v. bin Salman*, No. 20-cv-3009

(D.D.C.), for the direct legal harm they caused DAWN, but also because the clear objective of Khashoggi's murder was to silence him and put an end to his calls, consistent with DAWN's mission, for democracy and observance of human rights in Saudi Arabia.  Extrajudicial killing of dissidents like Khashoggi is precisely the type of abusive government practice that DAWN seeks to highlight and ultimately end.  The February 7, 2020 National Intelligence Council Memorandum ("NICM") holds information that is central both to DAWN's prosecution of its own suit against bin Salman and to DAWN's global mission, and the United States government should not use classification as a fig leaf to protect foreign wrongdoers, or their United States-based enablers, from public scrutiny.  Doing so is no less anti-democratic than the very governments that DAWN seeks to reform.

## INTRODUCTION

Accountability is a fundamental principle of the Freedom of Information Act ("FOIA"), and FOIA promotes accountability by ensuring that government carries out its functions transparently.  Opacity, on the other hand, breeds corruption and public mistrust.  While FOIA contains several exemptions, courts consistently caution that those exemptions are to be construed narrowly and do not give government agencies the authority to shield documents merely to avoid embarrassment, to avoid revelation of errors and failures, or based on nothing more than generic or speculative risks of harm.  The government here, through ODNI, however, invokes FOIA exemptions and attempts to substantiate its refusal to disclose the NICM with just that.  And it does so in bad faith.  President Trump's conduct and statements make clear that any claims of national security to block disclosure of the NICM are nothing more than a smokescreen to protect wrongdoers from accountability.  Rather, well-established facts make clear that ODNI's position serves one purpose: to further President Trump's and son-in-law Jared Kushner's personal relationships with key members of the Saudi regime responsible for the silencing-by-murder of

Khashoggi.  Disclosure of the NICM, rather than compromising national security as ODNI baldly asserts, would further the public's interest and the national interest in ensuring that foreign criminals and human-rights abusers, along with their enablers within the United States government, are held accountable for their actions.

## ARGUMENT

### A.      Background, Purpose, And Intent Of FOIA.

FOIA, 5 U.S.C. § 552, requires federal agencies to make Government records available to the public. *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011).  Congress enacted FOIA to overhaul section 3 of the Administrative Procedure Act (APA), 5 U.S.C. § 1002 (1964 ed.), which was "generally recognized as falling far short of its disclosure goals and came to be looked upon more as a withholding statute than a disclosure statute." *Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976).

The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed. *N.L.R.B. v. Robbins Tire & Rubber Co*., 437 U.S. 214, 242 (1978).  Specifically, Congress intended the FOIA to "permit access to official information long shielded unnecessarily from public view." *EPA v. Mink*, 410 U.S. 73, 80 (1973).  FOIA requires "agencies to adhere to 'a general philosophy of full agency disclosure.' . . . [C]ongress believed that this philosophy, put into practice, would help 'ensure an informed citizenry, vital to the functioning of a democratic society.'" *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989) (citations omitted).

FOIA mandates that an agency disclose records on request, unless they fall within one of nine exemptions.  "These exemptions are intended to be narrowly construed to ensure that Government agencies do not develop a rubber stamp, 'top secret' mentality behind which they can

shield legitimately disclosable documents." *Lawyers Comm. for Human Rights v. I.N.S.*, 721 F. Supp. 552, 560 (S.D.N.Y. 1989).  The burden of demonstrating that an exemption applies is with the agency seeking to avoid disclosure.  *Mead Data Cent., Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977).

Courts recognize that FOIA places a "strain on litigants in an action seeking disclosure under the act" and that "while the withholding agency has the burden of demonstrating that one of the statutory exemptions applies, they, as custodians of the documents, are the only parties with the ability to adequately characterize the nature and factual content of the materials." *Williams v. McCausland*, Nos. 90-cv-7563, 91-cv-7281. 1994 WL 18510, at *6 (S.D.N.Y. Jan. 18, 1994).  The party seeking disclosure, therefore, must rely on the statements of their opponents in their efforts to defeat the applicability of the exemption.  *Mead*, 566 F.2d at 250.  This asymmetry in information "seriously distorts the traditional adversary nature of our legal system's form of dispute resolution."  *See Donovan v. Federal Bureau of Investigation*, 806 F.2d 55, 58 (2d Cir. 1986); *see also Lawyers Comm.*, 721 F. Supp. at 560.  When reviewing an agency's determination that sought-after materials fit within one of the statutory exemptions, a district court is not limited to review of the quality of agency decision-making.  "[The district court] decides a claim of exemption *de novo* and the agency's opinions carry no more weight than those of any other litigant in an adversarial contest before a court." *Mead*, 566 F.2d at 251.  "[B]lind deference is precisely what Congress rejected when it amended FOIA in 1974."  *Halpern v. Federal Bureau of Investigation*, 181 F.3d 279, 293 (2d Cir. 1999).

### B.    FOIA Exemptions 1 And 3 Are Not Rubber Stamps.

ODNI's invocation of Exemptions 1 and 3 here amount to precisely the rubber stamp that this court warned of in *Lawyers Comm.*, 721 F. Supp. at 560.  Ignoring the fact that assertions of FOIA exemptions must be narrowly construed, ODNI attempts to argue in its brief that using

certain generic magic words is all an agency need do to prevent disclosure of government documents to the public, which would effectively amount to unchecked authority to do so. Yet ODNI's interpretation is far from the case.

Summary judgment is the means by which FOIA cases are typically resolved. *See, e.g.*, *Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999). An agency asserting a FOIA exemption bears the burden of proof and "all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009). And even where an exemption is applicable to some portion of a withheld record, the agency must take "reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii)(II). Here, ODNI has withheld the entirety of the NICM without making any apparent attempt to segregate the information contained therein based on broad assertions of potential harms to national security. In particular, ODNI asserts that the NICM was properly withheld under Exemptions 1 and 3 because disclosure "would reveal classified and statutorily protected information pertaining to intelligence activities and intelligence sources and methods— or lack thereof—and could reasonably be expected to result in damage to national security." Dkt. 18 at 7. While a government agency is entitled to deference in a FOIA case potentially implicating national security, this deference is not boundless. *See, e.g.*, *ACLU v. United States Dep't of Defense*, 901 F.3d 125, 133–34 (2d Cir. 2018) ("concerns of national security and foreign relations do not warrant abdication of the judicial role") (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)); *Ctr. for Nat. Sec. Studies v. United States Dep't of Justice*, 331 F.3d 918, 940 (D.C. Cir. 2003) (Tatel, J., dissenting) ("By accepting the government's vague, poorly explained allegations, and by filling in the gaps in the government's case with its own assumptions about facts absent from the record, this court has converted deference into acquiescence.").

An agency affidavit attempting to justify the nondisclosure of records subject to a FOIA request is entitled to a "presumption of good faith." *Carney .v United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). But where the affidavit does not describe the justifications for nondisclosure "with reasonably specific detail, [and] demonstrate that the information withheld logically falls within the claimed exemption," the government has not met its burden of proof. *Wilner*, 592 F.3d at 73. "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping" do not suffice. *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). An agency's justification for invoking a FOIA exemption is generally sufficient "if it appears logical or plausible." *Id.* at 862.

Even assuming, however, that Director Koch's affidavit meets this standard, an affidavit can nonetheless fail to justify the applicability of a FOIA exemption under certain circumstances. Such circumstances are present here. Where agency affidavits are "controverted by either contrary evidence in the record" [or] by evidence of agency bad faith," *Wilner*, 592 F.3d at 73, the agency has failed to meet its burden. *See also Campbell v. United States Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999) ("Among the reasons that a declaration might be insufficient are lack of detail and specificity, bad faith, and failure to account for contrary record evidence."). A finding of bad faith must be grounded in "evidence suggesting bad faith on the part of the [agency]." *Larson*, 565 F.3d at 864; *see also Jones v. FBI*, 41 F.3d 238, 242–43 (6th Cir. 1994) ("Even where there is no evidence that the agency acted in bad faith with regard to the FOIA action itself there may be evidence of bad faith or illegality with regard to the underlying activities which generated the documents at issue. Where such evidence is strong, it would be an abdication of the court's responsibility to treat the case in the standard way and grant summary judgment."). In light of the unprecedented circumstances surrounding the murder of Khashoggi, the well-

documented cover-up that followed, and the conflicting government statements regarding the records at issue here, a more exacting review of the ODNI's justifications is warranted.

### C.     Evidence Of Bad Faith Supports Denying ODNI's Summary Judgment Motion.

Here, there is ample evidence of bad faith on the part of the Administration.  ODNI has decided to place President Trump's personal interests—in cultivating a personal relationship with bin Salman and in concentrating power—above the national security and public interest of the United States.  Furthermore, the Administration has placed the interests of foreign criminals and their co-conspirators or enablers, both foreign and domestic, above the necessity for accountability for and redress of a brutal murder committed upon a journalist and democracy advocate living in exile in the United States.  The murderers' purpose is also clear: to silence Khashoggi and his U.S.-based advocacy organization permanently.  The statements and actions of the Administration and its surrogates in discussing and conducting the investigation of Khashoggi's murder ring hollow, and ODNI's claim to a national security interest in preventing disclosure of the NICM is nothing but a red herring to distract from the Administration's true intentions.

ODNI argues that "[r]elease of the information provided . . . to Congress in response to sections 1277 and 5714 of the FY 20 NDAA would reveal intelligence activities and intelligence sources and methods such as collection capacity, or lack thereof, and the existence or non-existence of relationships with foreign entities."  Dkt. 18 at 8.  This justification, however, has been flatly contradicted by President Trump in his incoherent and inconsistent public pronouncements on Khashoggi's murder.  President Trump had every opportunity to refuse to discuss the murder on the basis of national security concerns, but decided not to.  Per President Trump, speaking on November 22, 2018: "the CIA doesn't say they did it. . . .  They said he might have done it – that's

a big difference."[1]   ODNI's claim that releasing the NICM would damage national security is unavoidably weakened by President Trump's willingness to publicly postulate on the intelligence community's findings as to Khashoggi's murder.   The potential role of senior Saudi government officials in the killing of Khashoggi was discussed in an official statement emanating from the White House on November 20, 2018.   In that statement, President Trump first remarked on Khashoggi's murder by announcing "the world is a very dangerous place!"[2]   He then iterated his now infamous equivocation: "After great independent research, we now know many details of this horrible crime. . . .   King Salman and Crown Prince Mohammad [sic] bin Salman vigorously deny any knowledge of the planning or execution of the murder of Mr. Khashoggi.   Our intelligence agencies continue to assess all information, but it could very well be that the Crown Prince had knowledge of this tragic event—maybe he did and maybe he didn't!"[3]   These actions of the Executive Branch are a far cry from refusing to discuss the information provided by the intelligence services on the basis that it would undermine national security.   Relying on such a justification here, to prevent public disclosure, constitutes bad faith per *Campbell.*

Indeed, President Trump has offered competing justifications for concealing the CIA and other U.S. intelligence agencies' determinations regarding bin Salman's role in the killing.   At times, President Trump seemed to accept bin Salman's proclaimed innocence: "He will always say that he didn't do it. . . .   He says that to everybody, and frankly I'm happy that he says that.   But

---

[1] Ex. 1, Kate Sullivan & Zachary Cohen, *Senate Dem on Armed Services panel: Trump lying about CIA report on Khashoggi*, CNN (Nov. 23, 2018), https://edition.cnn.com/2018/11/23/ politics/senate-dem-armed-services-cia-khashoggi/index.html.   Citations to exhibits are to the accompanying Declaration of Amit B. Patel unless otherwise noted.

[2] Ex. 2, Statement from President Donald J. Trump on Standing with Saudi Arabia (Nov. 20, 2018), https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-standing-saudi-arabia/.

[3] *Id.*

he will say that to you, he will say that to Congress, and he will say that to everybody.  He's never said he did it."[4]  When Bob Woodward asked President Trump if he believed bin Salman to have ordered the murder, he replied "No, he says that he didn't do it."[5]  At other points, however, he appears to assume bin Salman's guilt and argue that economic imperatives prevent him from taking action to ensure accountability.  In an interview with NBC's Chuck Todd, discussing the potential for an investigation into bin Salman's role in the killing, Todd asked if the Administration would overlook the Saudi leadership's role in the murder, in return for continuing arms sales.  President Trump responded "But I'm not like a fool that says, 'We don't want to do business with them.' And by the way, if they don't do business with us, you know what they do?  They'll do business with the Russians or with the Chinese. . . .  Take their money.  Take their money, Chuck."[6]

To be clear: these are competing and mutually inconsistent rationales for refusing to investigate bin Salman.  It cannot both be that President Trump believes bin Salman's innocence, and also that he believes he is guilty but sanctioning him is not worth the economic repercussions.  Whether the Court wishes to accept either of these should have no impact on the disposition of ODNI's motion.  The crucial point is that neither justification is rooted in national security concerns, which ODNI invokes here in order to prevent disclosure.

Finally, beyond President Trump's possible belief in bin Salman's innocence or in the necessity of continuing arms sales, President Trump's reasoning for shielding him from scrutiny

---

[4] Ex. 3, Sonam Sheth and John Haltiwanger, *'I saved his a—': Trump boasted that he protected Saudi Crown Prince Mohammed bin Salman after Jamal Khashoggi's brutal murder, Woodward's new book says*, Business Insider (Sep. 10, 2020), https://www.businessinsider.com/ trump-woodward-i-saved-his-ass-mbs-khashoggi-rage-2020-9.

[5] *Id.*

[6] Ex. 4, President Trump's full, unedited interview with Meet the Press, NBC (Jun. 23, 2019), https://www.nbcnews.com/politics/meet-the-press/president-trump-s-full-unedited-interview-meet-press-n1020731.

has taken more obvious and nefarious forms that make clear President Trump's personal interests in doing so.  The Saudis are loyal customers of President Trump's personal businesses, and President Trump's carefully crafted proclamation that he has no financial interests in Saudi Arabia[7] does not change the fact that Saudis have spent millions on rooms in President Trump's hotels and on purchasing Trump-owned properties.[8]  In 2017, Saudi lobbyists spent $270,000 to reserve rooms at Trump's hotel in Washington.[9]  Amidst flagging bookings in 2018, significant Saudi bookings into Trump hotels in Chicago and New York cushioned the financial blow to the Trump business.[10]  One "last-minute" visit by bin Salman drove the Trump International Hotel in Manhattan's room revenue up 13 percent in the first three months of 2018, following a two-year decline[11] (bin Salman did not stay in the Trump hotel, as the suites were not large enough, but the hotel accommodated many of his travel companions[12]).  In Chicago, Saudi bookings in President Trump's hotel increased by 169 percent between the first half of 2016 and the first half of 2018.[13]

---

[7] Ex. 5, Noah Bookbinder, *President Trump has a massive conflict of interest on Saudi Arabia*, Washington Post (Oct. 18, 2018), https://www.washingtonpost.com/outlook/2018/10/18/president-trump-has-massive-conflict-interest-saudi-arabia/.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Ex. 6, Anna Massoglia and Karl Evers-Hillstrom, *World of Influence: A guide to Trump's foreign business interests*, Open Secrets (Jun. 4, 2019), https://www.opensecrets.org/news/2019/06/trump-foreign-business-interests/.

[12] Ex. 7, David A. Fahrenthold and Jonathan O'Connell, *At President Trump's hotel in New York, revenue went up this spring — thanks to a visit from big-spending Saudis*, Washington Post (Aug. 3, 2018), https://www.washingtonpost.com/politics/at-president-trumps-hotel-in-new-york-revenue-went-up-this-spring--thanks-to-a-visit-from-big-spending-saudis/2018/08/03/58755392-9112-11e8-bcd5-9d911c784c38_story.html.

[13] Ex. 8, David A. Fahrenthold, Jonathan O'Connell, and Morgan Krakow, *At Trump's big-city hotels, business dropped as his political star rose, internal documents show*, Washington Post (Oct. 4, 2018), https://www.washingtonpost.com/politics/at-trumps-big-city-hotels-business-

President Trump himself has boasted of his tight bond with Saudis, stating at a campaign rally before his election that he "get[s] along great with all of them" because "[t]hey buy apartments from [him]" and "spend $40 million, $50 million."[14]   In his interview with Bob Woodward discussed *supra*, President Trump boasted that he "saved [bin Salman's] ass" and that he was "able to get Congress to leave him alone . . . able to get them to stop."[15]   When quizzed on what he meant by that statement, he responded, "You'll have to figure that out yourself."[16]   Again, President Trump refused to invoke national security arguments in support of pressing Congress to "leave him alone," and instead not-so-subtly implied that he did so as a favor granted to a foreign leader who also happened to help line President Trump's pockets.

The negative impact of such statements and conduct on the dignity of the President's office notwithstanding, it is clear that they bear no relation to national security.   ODNI's claim that national security concerns prevent the release of documents are plainly out of kilter with the public, on-the-record, justifications offered by President Trump.   To deploy them in the face of a FOIA request against that backdrop constitutes bad faith in and of itself.

Beyond President Trump's own statements are several additional indications that bad faith underlies ODNI's refusal to disclose the details of Khashoggi's murder.   Jared Kushner, the President's son-in-law and senior adviser to his Administration, holds a close relationship with bin Salman that precedes Khashoggi's murder.   Following the murder and the accompanying international furor, Kushner became, according to multiple accounts, bin Salman's most ardent

---

dropped-as-his-political-star-rose-internal-documents-show/2018/10/03/bd26b1d6-b6d4-11e8-a7b5-adaaa5b2a57f_story.html.

[14] Bookbinder, *supra* n.7.

[15] Sheth & Haltiwanger, *supra* n.4.

[16] *Id.*

defender within the Administration,[17] appearing to refer to the murder as a mere "misstep[]" that should be overlooked because the Saudis otherwise "[ha]ve been a very good ally."[18]  The relationship has been the subject of criticism, including from the former Secretary of State Rex Tillerson and National Security Adviser H.R. McMaster, based on the fact Kushner was bypassing traditional avenues and freewheeling foreign policy; "Who is secretary of state here?" Mr. Tillerson reportedly remarked.[19]  Mr. Kushner and bin Salman are reportedly in regular contact through the online messaging application WhatsApp[20] and address each other by first name.[21] And in October 2017, Jared Kushner made an unannounced trip to Riyadh, where, according to David Ignatius of the Washington Post, "the two princes are said to have stayed up until nearly 4 a.m. several nights, swapping stories and planning strategy."[22]  Kushner also visited Saudi Arabia in February 2019, after the murder of Khashoggi: a visit which again largely took place outside of

---

[17] Ex. 9, David D. Kirkpatrick, Ben Hubbard, Mark Landler, and Mark Mazzetti, *The Wooing of Jared Kushner: How the Saudis Got a Friend in the White House*, N.Y. Times (Dec. 8, 2018), https://www.nytimes.com/2018/12/08/world/middleeast/saudi-mbs-jared-kushner.html.

[18] Ex. 10, Bill Powell, *Exclusive: Jared Kushner Gets Candid About Struggling Trump Campaign, Mideast Peace, More*, Newsweek (Jul. 20, 2020), https://www.newsweek.com/2020/07/24/exclusive-jared-kushner-gets-candid-about-struggling-trump-campaign-mideast-peace-more-1518952.html.

[19] Ex. 11, Carol D. Leonnig, Shane Harris, Josh Dawsey and Greg Jaffe, *How Jared Kushner forged a bond with the Saudi crown prince*, Washington Post (Mar. 3, 2018), https://www.washingtonpost.com/politics/how-jared-kushner-forged-a-bond-with-the-saudi-crown-prince/2018/03/19/2f2ce398-2181-11e8-badd-7c9f29a55815_story.html.

[20] Ex. 12, Erin Durkin, *Jared Kushner using WhatsApp to speak to foreign contacts, top Democrat says*, The Guardian (Mar. 21, 2019), https://www.theguardian.com/us-news/2019/mar/21/jared-kushner-whatsapp-house-oversight-information.

[21] Kilpatrick, et al., *supra* n.17.

[22] Ex. 13, David Ignatius, *The Saudi crown prince just made a very risky power play*, Washington Post (Nov. 5, 2017), https://www.washingtonpost.com/opinions/global-opinions/the-saudi-crown-princes-risky-power-play/2017/11/05/4b12fcf0-c272-11e7-afe9-4f60b5a6c4a0_story.html.

official protocol and embassy involvement.[23]   For his part, bin Salman has reportedly bragged about the influence he has over Kushner, describing President Trump's senior adviser and father of President Trump's grandchildren as "in his pocket."[24]   Indeed, it was Kushner who convinced President Trump to make Saudi Arabia the first foreign destination of his presidency.[25]   And it is Kushner who has visited Saudi Arabia as recently as December 2020, likely to continue cultivating his relationships there given that it is a significant source of capital that he could leverage for his possible return to the real estate business following the end of President Trump's term.[26]

President Trump has also flatly refused to pay due regard to Congress's attempts to bring accountability for Khashoggi's murder.   The purpose of Congress in enacting Sections 1277 and 5714 of the NDAA was to reveal the extent of the Saudi leadership's involvement in the murder, requiring ODNI to provide a report on the murder within 30 days of enactment.   After missing the deadline by a month, ODNI issued a letter to the Senate Intelligence Committee rejecting the legislation's requirement for the issuance of an unclassified report identifying those responsible for the murder of Khashoggi.[27]   The move prompted condemnation from Democratic and

---

[23] Ex. 14, Abigail Tracy, *"It Looks Bad. It Smells Bad. It Is Bad": Democrats Are Digging Into Kushner's Cozy Relationship With M.B.S.*, Vanity Fair (Apr. 11, 2019), https://www.vanityfair.com/news/2019/04/democrats-probe-jared-kushner-relationship-with-mbs.

[24] Ex. 15, Mohamad Bazzi, *The heart of the US-Saudi relationship lies in the Kushner-prince friendship*, The Guardian (Mar. 10, 2019), https://www.theguardian.com/commentisfree/2019/mar/10/us-saudi-arabia-trump-kushner-mohammed-bin-salman.

[25] *Id.*

[26] Ex. 16, Jacqueline Alemany, *Power Up: Jared Kushner's Middle East diplomacy could help him after he leaves the White House*, Washington Post (Dec. 3, 2020), https://www.washingtonpost.com/politics/2020/12/03/power-up-jared-kushners-middle-east-diplomacy-could-help-him-after-he-leaves-white-house/.

[27] Ex. 17, Olivia Gazis, *Lawmakers push for declassification of intelligence on Khashoggi murder*, CBS News (Mar. 3, 2020), https://www.cbsnews.com/news/jamal-khashoggi-declassification-intelligence-saudi-dissident-murder/.

Republican lawmakers alike.  On March 2, 2020, Senator Richard Burr, Republican Chairman of the Senate Intelligence Committee, and Senator Mark Warner, Democratic Vice Chairman of the Committee, sent a letter to Richard Grenell at ODNI, urging the acting Director to reconsider his agency's decision not to declassify information related to the murder.[28]  In a letter to the Director, Representative Adam Schiff, Chair of the House Intelligence Committee, stated, "failure to declassify the annex and produce an unclassified report could give rise to concerns that ODNI is using the classification process impermissibly in order to shield information of intense public interest from public release," noting that "there is a robust body of credible unclassified reporting" regarding Khashoggi's killing.[29]

The Administration has demonstrated similar contempt for Congress when considering the case of Khashoggi under the Global Magnitsky Human Rights Accountability Act.  In a bipartisan effort, on October 22, 2018, 22 senators sent a letter to President Trump requiring him to make a determination under the Act as to sanctions for any foreign person responsible for "extra-judicial killings, torture, or other gross violations of internationally-recognized human rights" in the case of Khashoggi.[30]  As the letter was sent by the two leaders of the Senate Foreign Relations Committee, the Administration was required to respond to the letter within 120 days.  Global

---

[28] Ex. 18, Ellen Nakashima, *Lawmakers want the DNI to make public the intelligence community's assessment of who's responsible for killing Jamal Khashoggi*, Washington Post (Mar. 3, 2020), https://www.washingtonpost.com/national-security/lawmakers-want-the-dni-to-make-public-the-intelligence-communitys-assessment-of-whos-responsible-for-killing-jamal-khashoggi/2020/03/03/aafa70ee-5d07-11ea-9055-5fa12981bbbf_story.html.

[29] *Id.*

[30] Ex. 19, Press Release, Chairman of the Senate Comm. on Foreign Relations, Corker, Menendez, Graham, Leahy Letter Triggers Global Magnitsky Investigation Into Disappearance of Jamal Khashoggi (Oct. 10, 2018), https://www.foreign.senate.gov/press/chair/release/corker-menendez-graham-leahy-letter-triggers-global-magnitsky-investigation-into-disappearance-of-jamal-khashoggi.

Magnitsky Human Rights Accountability Act, Pub. L. No. 114-328, § 1263(d)(1), 130 Stat. 2533, 2534 (Dec. 23, 2016). As of yet, 814 days since the letter was sent, President Trump has not complied with the Act as to bin Salman.[31]

While the Trump Administration dodged Congress' demands to provide answers on the killing, the United Nations Special Rapporteur on extrajudicial, summary or arbitrary killings, Agnès Callamard, produced a report on June 19, 2019, issuing the findings of her investigation into the murder.[32]  Ms. Callamard opined on the culpability of bin Salman for the murder, citing the existence of "credible evidence, warranting further investigation of high-level Saudi officials' individual liability, including that of the Crown Prince."  The report, *inter alia*, called for the United States to open an FBI investigation, and to the extent possible consistent with national security, declassify and release to the public all documents relating to the murder.[33]

In sum, in light of this record, ODNI's argument—that it seeks to prevent release of the NICM solely in the interest of national security—falls flat.  The Trump Administration has treated the case of Khashoggi's murder with marked bad faith.  It has, on the record, offered competing and inconsistent justifications to release the information, in the face of pressure from Congress and the United Nations.  The coziness of the relationships between bin Salman and both President Trump and Kushner, subject to criticism within the Administration, casts doubt on the fair-minded nature of deliberations on the release of the documents.  And, President Trump himself has

---

[31] Ex. 20, Nicole Gaouette and Kevin Liptak, *White House refuses to meet Congress' deadline on Khashoggi killing*, CNN (Feb. 8, 2019), https://www.cnn.com/2019/02/08/politics/white-house-khashoggi-deadline/index.html.

[32] Ex. 21, United Nations, Office of the High Commissioner for Human Rights, Khashoggi killing: UN human rights expert says Saudi Arabia is responsible for "premeditated execution" (June 19, 2019), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=24713.

[33] *Id.*

remarked that his treatment of the case stems not from any national security concerns, but instead from his own attempt to help bin Salman escape accountability and "save[] [bin Salman's] ass."

The overwhelming evidence of bad faith makes clear that, at the very least, summary judgment in favor of ODNI is not warranted, and this Court should deny ODNI's motion.

### D.  Disclosure Of The NICM Is Consistent With The Goals Of FOIA And In The Public Interest.

DAWN seeks—and deserves, as now-President-Elect Biden has unequivocally acknowledged[34]—accountability for the murder of Khashoggi, a U.S.-based journalist and democracy advocate who founded DAWN, his U.S.-based organization.  Khashoggi was murdered for pursuing DAWN's mission, promoting democratic reform in the Arab world, and for exercising fundamental U.S. rights to write, speak, and publish freely in consistent with that mission.

As part of DAWN's overall mission, it seeks to expose the nature of repressive regimes in the Middle East and North Africa and to influence United States foreign policy.  Consistent with that purpose, revealing the identities of those behind Khashoggi's murder is crucial not only in DAWN's efforts to achieve accountability for the murder of its founder, but also to expose to both the American and Arab publics the activities of their governments and revealing to them the true nature of their leaders.

Khashoggi's exercise of his right to free speech played a large part in prompting the Saudi leadership to murder him.  He wrote extensively on the matters of democratic rights and civil liberties, and on the principle of accountability for those in power—the very principle that underlies FOIA.  He spoke of the important role that foreign governments had to play in preventing

---

[34] Ex. 22, Anniversary of Jamal Khashoggi's Murder—Statement by Vice President Joe Biden (Oct. 2, 2020), https://joebiden.com/2020/10/02/anniversary-of-jamal-khashoggis-murder-statement-by-vice-president-joe-biden/.

human rights abuses in the Middle East and North Africa: "We need to defend the rights of the Arab people to have democracy in our own countries, in our own localities, but at the same time we must speak to foreign leaders, foreign powers and foreign parliamentarians.  They have a role to play and many of them have begun to lose hope in the prospects of Arab democracy."[35]  He decried that bin Salman "appears to be moving the country from old-time religious extremism to his own 'You-must-accept-my-reform' extremism, without any consultation—accompanied by arrests and the disappearance of his critics."[36]  The Saudi authorities began to persecute him in part because he expressed skepticism on the incoming Trump Administration: "The government banned me from Twitter when I cautioned against an overly enthusiastic embrace of then-President-elect Donald Trump."[37]  He produced a vision of the ideal he believed in, a public square for the Arab world: "the social reforms that are so important to Saudi Arabia cannot come at the expense of the public space once available to us for discussion and debate.  Repression and intimidation are not—and never should be—the acceptable companions of reform."  And, evoking the principles underlying the founding of the American Republic, he wrote, "stabilizing democracy and driving people to believe in it is the only way forward for peace."[38]  It was for advocating

---

[35] Ex. 23, Jamal Khashoggi, *Why the Arab World Needs Democracy Now*, N.Y. Times (Oct. 22, 2018), https://www.nytimes.com/2018/10/22/opinion/khashoggi-mbs-arab-democracy.html.

[36] Ex. 24, Jamal Khashoggi and Robert Lacey, *Britain once had a 'big stick', now the prime minister has little influence over Prince Mohammed bin Salman, and her only concern will be for Saudi Arabia's money*, The Guardian (Mar. 6, 2018), https://www.theguardian.com/commentisfree/2018/mar/06/crown-prince-saudis-theresa-may-britain-saudi-arabia-money.

[37] Ex. 25, Jamal Khashoggi, *Saudi Arabia wasn't always this oppressive.  Now it's unbearable*, Washington Post (Sep. 18, 2017), https://www.washingtonpost.com/news/global-opinions/wp/2017/09/18/saudi-arabia-wasnt-always-this-repressive-now-its-unbearable/.

[38] Ex. 26, Jamal Khashoggi, *Only democracy can stop the bloodshed*, Al-Arabiya (Jun. 12, 2016), https://english.alarabiya.net/en/views/news/middle-east/2016/06/12/Only-democracy-can-stop-bloodshed.html.

these ideals that he was put to death.  The Court should vindicate those ideals, the purpose of FOIA, and Khashoggi's life, by denying ODNI's motion.

### E.        In The Alternative, The Court Should Review The NICM *In Camera*.

"*In camera* review is necessary when the validity of the government assertion of exemptions cannot realistically be evaluated without information other than that contained in the affidavits, and discovery would compromise the secrecy asserted." *Lawyers Comm.*, 721 F. Supp. at 566 (citing *Arieff v. United States Dep't of the Navy*, 712 F.2d 1462 (D.C. Cir. 1983)).  While "*[i]n camera* review is considered the exception, not the rule" because of the burdensome demands that such review can place on district courts, particularly as to broad requests where the disputed documents are voluminous, *Local 3, Int'l Bhd. of Elec. Workers, AFL–CIO v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988), *in camera* review of the two-page NICM at issue here would present a significantly less substantial burden on the Court's resources.  Whether to conduct an *in camera* review of the NICM is within this Court's discretion, and doing so would be a valid exercise of that discretion, particularly where, as here, the ODNI statements in support of its position are so conclusory in nature.  *See Halpern*, 181 F.3d at 295 (noting that "[a]rguably, [*in camera*] review would have been appropriate—given the conclusory nature of the [defendant's supporting declaration]").  ODNI has not, except in the most broad, generic terms, explained why the NICM fits within the scope of Exemptions 1 or 3, and instead, merely parrots the relevant statutory and executive order language.  *See* Dkt. 17 at 8–11.  ODNI's explanation frustrates this Court's responsibility to conduct a *de novo* review of ODNI's response, so this Court should, in the alternative, order ODNI to submit the NICM in unredacted form for *in camera* review.  *See Physicians for Human Rights v. United States Dep't of Def.*, 675 F. Supp. 2d 149, 169–70 (D.D.C. 2009) (ordering *in camera* review of unredacted seven-page document pursuant to Exemption 1,

where government submissions "do not describe [redacted pages'] content, or explain—in specific, non-generic terms—why it fits within the scope of Exemption 1").

## CONCLUSION

Jamal Khashoggi was a resident of the United States.  He was advancing democracy and human rights through his work at DAWN when he was murdered.  The record indicates he was murdered in order to silence him at the behest of Mohammed bin Salman.  Covering up this heinous crime to advance President Trump's pecuniary and other interests is not justification to withhold the NICM from disclosure.  Indeed, disclosure is critically necessary to fulfill one of the central purposes of FOIA: accountability of the governing by the governed.

For the foregoing reasons, DAWN respectfully submits that the Court should deny ODNI's motion for summary judgment and grant OSJI's cross-motion for summary judgment.

Dated: January 13, 2021

Respectfully submitted,


By:    /s/ Keith M. Harper
Keith M. Harper
Julian P. SpearChief-Morris
Umer M. Chaudhry
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, DC 20001
Telephone:  +1 202 639 3000
Facsimile:  +1 202 639 6066

Amit B. Patel
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Telephone:  +1 312 222 9350
Facsimile:  +1 312 527 0484

*Counsel for Democracy for the Arab World Now*